# Exhibit A

# 2006 Administrative Settlement Agreement and Order on Consent

UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY
REGION 5

| | |
|---|---|
| IN THE MATTER OF:<br>SOUTH DAYTON DUMP AND<br>LANDFILL | ADMINISTRATIVE SETTLEMENT<br>AGREEMENT AND ORDER ON<br>CONSENT FOR REMEDIAL<br>INVESTIGATION/FEASIBILITY STUDY |
| City of Moraine | U.S. EPA Region 5<br>CERCLA Docket No. _____ |
| Montgomery County, Ohio | |
| Respondents | Proceeding Under Sections 104, 107 and<br>122 of the Comprehensive Environmental<br>Response, Compensation, and Liability Act,<br>as amended, 42 U.S.C. §§ 9604, 9607 and<br>9622. |
| Listed in Appendix C | |

VEW- '06-C-852



EXHIBIT

A

## RI/FS ADMINISTRATIVE SETTLEMENT AGREEMENT AND ORDER ON CONSENT

### TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | JURISDICTION AND GENERAL PROVISIONS | 1 |
| II. | PARTIES BOUND | 2 |
| III. | STATEMENT OF PURPOSE | 2 |
| IV. | DEFINITIONS | 3 |
| V. | FINDINGS OF FACT | 5 |
| VI. | CONCLUSIONS OF LAW AND DETERMINATIONS | 8 |
| VII. | SETTLEMENT AGREEMENT AND ORDER | 9 |
| VIII. | DESIGNATION OF CONTRACTORS AND PROJECT COORDINATORS | 9 |
| IX. | WORK TO BE PERFORMED | 11 |
| X. | U.S. EPA APPROVAL OF PLANS AND OTHER SUBMISSIONS | 15 |
| XI. | QUALITY ASSURANCE, SAMPLING, AND DATA AVAILABILITY | 17 |
| XII. | SITE ACCESS AND INSTITUTIONAL CONTROLS | 19 |
| XIII. | COMPLIANCE WITH OTHER LAWS | 19 |
| XIV. | RETENTION OF RECORDS | 20 |
| XV. | DISPUTE RESOLUTION | 20 |
| XVI. | STIPULATED PENALTIES | 21 |
| XVII. | FORCE MAJEURE | 25 |
| XVIII. | PAYMENT OF RESPONSE COSTS | 25 |
| XIX. | COVENANT NOT TO SUE BY U.S. EPA | 28 |
| XX. | RESERVATIONS OF RIGHTS BY U.S. EPA | 28 |
| XXI. | COVENANT NOT TO SUE BY RESPONDENTS | 29 |
| XXII. | OTHER CLAIMS | 31 |
| XXIII. | CONTRIBUTION | 31 |
| XXIV. | INDEMNIFICATION | 32 |
| XXV. | INSURANCE | 32 |
| XXVI. | FINANCIAL ASSURANCE | 33 |
| XXVII. | SEVERABILITY/INTEGRATION/APPENDICES | 34 |
| XXVIII. | ADMINISTRATIVE RECORD | 35 |
| XXIX. | EFFECTIVE DATE AND SUBSEQUENT MODIFICATION | 35 |
| XXX. | NOTICE OF COMPLETION OF WORK | 36 |

Appendix A  
Appendix B  
Appendix C

ADMINISTRATIVE SETTLEMENT AGREEMENT AND ORDER ON CONSENT
FOR REMEDIAL INVESTIGATION/FEASIBILITY STUDY

## I. JURISDICTION AND GENERAL PROVISIONS

1.  This Administrative Settlement Agreement and Order on Consent ( "Settlement Agreement") is entered into voluntarily by the United States Environmental Protection Agency ("U.S. EPA") and the Respondents listed in Appendix C ("Respondents"). The Settlement Agreement concerns the preparation and performance of a remedial investigation and feasibility study ("RI/FS") at the South Dayton Dump and Landfill Site located on Dryden Road (sometimes called Springboro Pike) in Moraine, Ohio.("Site") and the reimbursement for future response costs incurred by U.S. EPA in connection with the RI/FS for this Site.

2.  This Settlement Agreement is issued under the authority vested in the President of the United States by Sections 104, 107 and 122 of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. §§ 9604, 9607 and 9622 ("CERCLA"). This authority was delegated to the Administrator of U.S. EPA on January 23, 1987, by Executive Order 12580,   52 Fed. Reg. 2926 (Jan. 29, 1987), and further delegated to Regional Administrators on May 11, 1994, by U.S. EPA Delegation Nos. 14-14-C and 14-14-D.  This authority was further redelegated by the Regional Administrator, U.S. EPA, Region 5 to the Director, Superfund Division, U.S. EPA, Region 5 by U.S. EPA Delegation Nos. 14-14-C and 14-14-D on May 2, 1996.

3.  In accordance with Section 104(b)(2) and Section 122(j)(1) of CERCLA, 42 U.S.C. §§ 9604(b)(2) and 9622(j)(1), U.S. EPA notified the Federal and State natural resource trustees on August 1, 2005 of negotiations with potentially responsible parties regarding the release of hazardous substances that may have resulted in injury to the natural resources under Federal trusteeship. In accordance with Section 121(f)(1)(F), U.S. EPA has notified the State of Ohio (the "State") on August 4, 2005, of negotiations with potentially responsible parties regarding the implementation of the remedial investigation and feasibility study for the Site.

4.  U.S. EPA and Respondents recognize that this Settlement Agreement has been negotiated in good faith and that the actions undertaken by Respondents in accordance with this Settlement Agreement do not constitute an admission of any liability. Respondents do not admit, and retain the right to controvert in any subsequent proceedings other than proceedings to implement or enforce this Settlement Agreement, the validity of the findings of fact, conclusions of law and determinations in Sections V and VI of this Settlement Agreement. Respondents agree to comply with and be bound by the terms of this Settlement Agreement and further agree that they will not contest the basis or validity of this Settlement Agreement or its terms.

1

## II. PARTIES BOUND

5. This Settlement Agreement applies to and is binding upon U.S. EPA and upon Respondents and their agents, heirs, successors and assigns. Any change in ownership or corporate status of a Respondent including, but not limited to, any transfer of assets or real or personal property shall not alter such Respondent's responsibilities under this Settlement Agreement.

6. Respondents are jointly and severally liable for carrying out all activities required by this Settlement Agreement. However, the financial contribution of Respondents Boesch and Grillot to carrying out the activities required by this Settlement Agreement is limited to the balance in the South Dayton Environmental Remediation Trust being made available to the other Respondents to carry out the Work. In the event of the insolvency or other failure of any one or more Respondents to implement the requirements of this Settlement Agreement, the remaining Respondents shall complete all such requirements.

7. Respondents shall ensure that their contractors, subcontractors, and representatives receive a copy of this Settlement Agreement and comply with this Settlement Agreement. Respondents shall be responsible for any noncompliance with this Settlement Agreement.

8. Each undersigned representative of Respondents certifies that he or she is fully authorized to enter into the terms and conditions of this Settlement Agreement and to execute and legally bind the Respondents to this Settlement Agreement.

## III. STATEMENT OF PURPOSE

9. In entering into this Settlement Agreement, the objectives of U.S. EPA and Respondents are: (a) to determine the nature and extent of contamination and any current or potential threat to the public health, welfare, or the environment posed by the release or threatened release of hazardous substances, pollutants or contaminants at or from the Site and to collect sufficient data for developing and evaluating effective remedial alternatives by conducting a Remedial Investigation ("RI") as more specifically set forth in the Statement of Work ("SOW") attached as Appendix A to this Settlement Agreement; (b) to identify and evaluate remedial alternatives that protect human health and the environment by preventing, eliminating, reducing or controlling any release or threatened release of hazardous substances, pollutants, or contaminants at or from the Site, by conducting a Feasibility Study ("FS") as more specifically set forth in the Statement of Work ("SOW") in Appendix A to this Settlement Agreement; and (c) to recover response and oversight costs incurred by U.S. EPA with respect to this Settlement Agreement.

10. The Work conducted under this Settlement Agreement is subject to approval by U.S. EPA and shall provide all appropriate and necessary information to assess site conditions and evaluate alternatives to the extent necessary to select a remedy that will be consistent with CERCLA and the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R.

Part 300 ("NCP"). Respondents shall conduct all Work under this Settlement Agreement in compliance with CERCLA, the NCP and all applicable U.S. EPA guidances, policies, and procedures.

## IV. DEFINITIONS

11. Unless otherwise expressly provided herein, terms used in this Settlement Agreement which are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this Settlement Agreement or in the appendices attached hereto and incorporated hereunder, the following definitions shall apply:

a. "ARARs" mean all applicable local, state, and federal laws and regulations, and all "applicable requirements" or "relevant and appropriate requirements" as defined at 40 C.F.R. § 300.5 and 42 U.S.C. § 9261(d).

b. "CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601, *et seq.*

c. "Day" shall mean a calendar day. In computing any period of time under this Settlement Agreement, where the last day would fall on a Saturday, Sunday, or Federal holiday, the period shall run until the close of business of the next working day.

d. "Effective Date" shall be the effective date of this Settlement Agreement as provided in Section XXIX.

e. "EPA" or "U.S. EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

g. "OEPA" shall mean the Ohio Environmental Protection Agency and any successor departments or agencies of the State.

h. "Engineering Controls" shall mean constructed containment barriers or systems that control one of the following: downward migration, infiltration or seepage of surface runoff or rain; or natural leaching migration of contaminants through the subsurface over time. Examples include caps, engineered bottom barriers, immobilization processes, and vertical barriers.

i. "Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs in, reviewing or developing plans, reports, technical memoranda and other items pursuant to this Settlement Agreement, conducting community relations, providing technical assistance grants to community groups (if any), verifying the Work, or otherwise implementing, overseeing, or enforcing this Settlement Agreement, including but not limited to, payroll costs, contractor costs (including fees), travel

costs, laboratory costs, ATSDR costs, the costs incurred pursuant to Paragraph 55 and 57 (costs and attorneys fees and any monies paid to secure access, including the amount of just compensation) and Paragraph 41 (emergency response)

    j.   "Institutional controls" shall mean non-engineered instruments, such as administrative and/or legal controls, that help to minimize the potential for human exposure to contamination and/or protect the integrity of a remedy by limiting land and/or resource use. Examples of institutional controls include easements and restrictive covenants, zoning restrictions, special building permit requirements, and well drilling prohibitions.

    k.   "Interest" shall mean interest at the rate specified for interest on investments of the U.S. EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year.

    l.   "NCP" or "National Contingency Plan" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

    m.   "Settlement Agreement" shall mean this Administrative Settlement Agreement and Order on Consent, the SOW, all appendices attached hereto (listed in Section XXVII) and all documents incorporated by reference into this document including without limitation U.S. EPA-approved submissions. U.S. EPA-approved submissions (other than progress reports) are incorporated into and become a part of the Settlement Agreement upon approval by U.S. EPA. In the event of conflict between this Settlement Agreement and any appendix, this Settlement Agreement shall control.

    n.   "Paragraph" shall mean a portion of this Settlement Agreement identified by an Arabic numeral.

    o.   "Parties" shall mean U.S. EPA and Respondents.

    p.   "RCRA" shall mean the Resource Conservation and Recovery Act, also known as the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901, *et seq.*

    q.   "Respondents" shall mean those Parties identified in Appendix C, which is a list of those Parties which have signed this Settlement Agreement and agreed to be bound by the terms of this Administrative Order on Consent (Settlement Agreement).

    r.   "RI/FS Planning Documents" shall mean the RI/FS Work Plan; the Sampling and Analysis Plan, consisting of both the Field Sampling Plan and the Quality Assurance Project Plan; Laboratory and Contractor Quality Management Plans; and a Health and Safety Plan.

s. "Section" shall mean a portion of this Settlement Agreement identified by a Roman numeral.

t. "Site" shall mean the South Dayton Dump and Landfill Superfund Site, ("Site") located on Dryden Road (sometimes called Springboro Pike) in Moraine, Ohio. The Site is depicted generally on the figures (map and aerial photograph of the Site) attached as Appendix B and includes nearby areas where hazardous substances, pollutants or contaminants have or may have come to be located from the Site, or from former operations at the Site.

u. "State" shall mean the State of Ohio.

v. "Statement of Work" or "SOW" shall mean the Statement of Work for development of a RI/FS for the South Dayton Dump and Landfill Site, as set forth in Appendix A to this Settlement Agreement. The Statement of Work is incorporated into this Settlement Agreement and is an enforceable part of this Settlement Agreement as are any modifications made thereto in accordance with this Settlement Agreement. The SOW is divided into eight numbered Tasks. Each Task is divided into numbered subdivisions (e.g., 1.2.1.3. Leachate Investigation). References to numbered Task subdivisions in the SOW will be so identified, for example, SOW Task 1.2.1.3. Leachate Investigation).

w. "Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27); and (4) any "hazardous waste" under Ohio Revised Code, Section 3734.01 (J).

x. "Work" shall mean all activities Respondents are required to perform under this Settlement Agreement, except those required by Section XIV (Retention of Records).

## V. FINDINGS OF FACT

12. Based on available information, including the Administrative Record in this matter, U.S. EPA hereby finds and, for purposes of enforceability of this Order only, the Respondents stipulate that the factual statutory prerequisites under CERCLA necessary for issuance of this Settlement Agreement and Administrative Order have been met. U.S. EPA's finding is based on the following specific findings which U.S. EPA asserts as facts:

13. The South Dayton Dump and Landfill Site comprises approximately 80 acres and is located at 1975 Dryden Road (sometimes called Springboro Pike) in Moraine, Ohio. The Site is adjacent to the floodplain of the Great Miami River. Approximately 25,060 people live within a 4-mile radius of the Site. Six single family residences are located on the northwest side of East River Road and are adjacent to the southeast boundary of the Site. A seventh single family home is located on the southeast side of East River Road and is within 300 feet of the Site. A trailer

5

park with several residences is also situated approximately 300 feet southeast of the Site at the southeast intersection of Dryden Road and East River Road.

14. Valley Asphalt, Jim City Salvage, the Miami Conservancy District, Ronald Barnett, Margaret C. Grillot and Kathryn A. Boesch are the current owners of the Site. A 49.87 acre portion of the Site (Parcel A) was purchased by Horace Boesch in 1937. In 1945 Horace Boesch purchased an additional 30 acre portion of the Site (Parcel B). In 1947, Horace and Roxie Boesch conveyed an undivided ½ interest in Parcel B to Cyril Grillot. In 1951, Horace and Roxie Boesch conveyed an undivided ½ interest in Parcel A to Cyril Grillot. From 1947 until the present, most of the Site has been owned by various members of the Boesch and Grillot families. In 1958, Horace and Roxie Boesch and Cyril J. and Ruby Grillot recorded a conveyance of a property interest (Right of Way Grant) to Dayton Power and Light. In 1975, Horace and Kathryn A. Boesch and Cyril J. and Ruby Grillot recorded a conveyance of a property interest (easement) to the University of Dayton. After Horace Boesch died in 1979, his estate conveyed shares of his interest in the Site property to members of his family. Some of these heirs conveyed their interest or a portion thereof to Katharine Boesch. Current owners of the real property where hazardous waste dumping and landfilling areas took place in the past, as part of the operations of the South Dayton Dump and Landfill, include Kathryn A. Boesch, Margaret C. Grillot, Valley Asphalt, Jim City Salvage, Miami Conservancy District and Ronald Barnett.

15. Disposal of waste materials began at the Site in 1941. Materials dumped at the Site included drummed wastes. Known hazardous substances were disposed at the Site between June 1973 and July 1976, including drums containing hazardous waste from nearby facilities. Some of the drums contained cleaning solvents (1,1,1-trichloroethane ("TCA"); methyl ethyl ketone ("MEK"); and xylene); cutting oils; paint; Stoddard solvents; and machine-tool, water-based coolants. Handwritten notes on an undated tax map from the Montgomery County Health Department indicate that the site had previously accepted materials including "oils, paint residue, brake fluids, chemicals for cleaning metals, solvents, etc." In addition, a CERCLA Notification of Hazardous Waste Site Form submitted by Industrial Waste Disposal Company, Inc. ("IWD") in 1981 indicated that the Site had been used as a disposal facility for the industrial and municipal wastes of IWD's customers. The notification did not include information about the specific types of wastes. More recently, the Site operated under a solid waste disposal permit issued by Moraine County Health Department ("MCHD"). The permit allowed disposal of solid, inert, insoluble materials such as unregulated foundry sand, slag, glass, and demolition debris. There is no liner at the Site.

16. In 1985, OEPA conducted a Preliminary Assessment ("PA") at the Site. Based on this PA's findings, a U.S. EPA Field Investigation Team ("FIT") conducted a Supplemental Site Investigation ("SSI") at the Site. In 1991, the FIT collected 11 soil samples at or near the Site. Contaminants have been detected in on-Site soil samples at levels above background. Additionally, hazardous substances were reportedly disposed of at the Site in the past.

17. Soil sample results during the 1991 EPA FIT sample detected hazardous substances in on-Site soil samples at levels significantly above background. The following substances were

6

detected: 1,2-Dichloroethene at 200 micrograms per kilogram in soil sample S8, tetrachloroethene at 11 micrograms per kilogram in soil sample S8, toluene at 7 micrograms per kilogram in soil sample S5, polychlorinated biphenyls, including Aroclor 1248 and Aroclor 1260 at 4,200 and 2,800 micrograms per kilogram, respectively, in soil sample S2, antimony at 31.6 milligrams per kilogram in soil sample S3, arsenic at 69.3 milligrams per kilogram in soil sample S9, barium as high as 991 milligrams per kilogram in soil sample S1, cadmium as high as 14 milligrams per kilogram in soil sample S3, chromium at 91.7 milligrams per kilogram in soil sample S3, mercury as high as .31 milligrams per kilogram in soil sample S3, nickel as high as 402 milligrams per kilogram in soil sample S8, lead as high as 3,300 milligrams per kilogram in soil sample S3, and zinc as high as 2,350 milligrams per kilogram in soil sample S3. Also, several polynuclear aromatic hydrocarbons were detected in several soil samples. Phenanthrene, benzo[a]anthracene, and benzo[a]pyrene were detected at concentrations as high as 16,000, 8,500, and 5,700 micrograms per kilogram, respectively, in soil sample S3; and fluoranthene was detected at 21,000 micrograms per kilogram in soil sample S6. Selected soil samples collected during OEPA's July 9, 1996 Phase II Site Team Evaluation Prioritization ("STEP") Investigation revealed higher concentrations than those found during the 1991 EPA FIT sampling. These samples included the following concentrations:

Tetrachloroethene: 59 micrograms/kilogram (S01)
Trichloroethene: 11 micrograms/kilogram (S10)
Antimony: 278 milligrams/kilogram (S08)
Arsenic: 141 milligrams/kilogram (S08)
Barium: 13,000 milligrams/kilogram (S08)
Cadmium: 16.3 milligrams/kilogram (S10)
Copper: 191,000 milligrams/kilogram (S10)
Lead: 12,100 milligrams/kilogram (S10)
Zinc: 11,500 milligrams/kilogram (S10)

*See* OEPA Site Team Evaluation Prioritization Report South Dayton Dump and Landfill, December 24, 1996, Table 1 on pages 18-21.

18. In 2000, Valley Asphalt conducted a drum and soil removal from real property it owned within the boundaries of the Site. A composite sample collected from the drums was TCLP toxic for cadmium (detected at 2.11 milligrams/liter; regulatory limit 1 milligram/liter) and lead (detected at 8.26 milligram/liter; regulatory limit 5 milligrams/liter) and contained contaminants including:

PCB-1254: 75,000 micrograms/kilogram
Benzene: 7,000 micrograms/kilogram
Chlorobenzene: 1,700 micrograms/kilogram
Ethylbenzene: 84,000 micrograms/kilogram
Toluene: 530,000 micrograms/kilogram
Trichloroethene: 64,000 micrograms/kilogram

Vinyl Chloride:840 micrograms/kilogram
Xylene: 340,000 micrograms/kilogram"

*See* Sample "Valley Dryden A 05/17/00" in "Appendix C, Laboratory Results" of TCA Environmental, Inc. "Environmental Remediation Report at Valley Asphalt, Dryden Road Moraine, Ohio, Montgomery County" prepared for Valley Asphalt dated September 5, 2000.

19. Between 1998 and 2004, the owners of part of the Site conducted several investigations at the landfill, including groundwater and surface water sampling. Groundwater analytical results from 2002 revealed maximum concentrations of vinyl chloride at 180 micrograms/liter (MW-101A) and trichloroethylene at 76 micrograms/liter in MW-210. In 2004 the maximum concentration of vinyl chloride detected in the groundwater by the owners was 20 microgram/liter (MW-101A) and the maximum concentration of trichloroethylene was 250 micrograms/liter (MW-210, sampling date 10/15/04). The U.S. EPA Maximum Contaminant Level ("MCL") for vinyl chloride is 2 micrograms/liter and the MCL for trichloroethylene is 5 micrograms/liter.

20. The South Dayton Dump and Landfill Site was proposed for inclusion on the National Priorities List ("NPL"), pursuant to CERCLA Section 105, 42 U.S.C. § 9605, on September 23, 2004. The Site received a Hazard Ranking Score ("HRS") of 48.63. *See* 69 FR 56970-01 (2004).

## VI. CONCLUSIONS OF LAW AND DETERMINATIONS

Based on the Findings of Fact set forth above, and the Administrative Record in this matter, U.S. EPA has determined that:

21. The South Dayton Dump and Landfill Site is a "facility" as defined in Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

22. The contamination found at the Site, as identified in the Findings of Fact above, includes"hazardous substances" as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

23. The conditions described in paragraphs 16-18 of the Findings of Fact above constitute an actual and/or threatened "release" of a hazardous substance from the facility as defined in Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

24. Each Respondent is a "person" as defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

25. Respondents are responsible parties under Sections 104, 107 and 122 of CERCLA, 42 U.S.C. §§ 9604, 9607 and 9622. Each Respondent is either: a person who generated the hazardous substances found at the Site, a person who at the time of disposal of any hazardous

substances owned or operated the Site, a person who is the "owner(s)" and/or "operator(s)" of the facility, as defined by Section 101(20) of CERCLA, 42 U.S.C. § 9601(20), and within the meaning of Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), or is a person who arranged for disposal or transport for disposal of hazardous substances at the Site. Each Respondent therefore may be liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

26. The actions required by this Settlement Agreement are necessary to protect the public health, welfare or the environment, are in the public interest, 42 U.S.C. § 9622(a), are consistent with CERCLA and the NCP, 42 U.S.C. §§ 9604(a)(1), 9622(a), and will expedite effective remedial action and minimize litigation, 42 U.S.C.§ 9622(a).

27. U.S. EPA has determined that Respondents are qualified to conduct the RI/FS within the meaning of Section 104(a) of CERCLA, 42 U.S.C.§ 9604(a), and will carry out the Work properly and promptly, in accordance with Sections 104(a) and 122(a) of CERCLA, 42 U.S.C. §§ 9604(a) and 9622(a), if Respondents comply with the terms of this Settlement Agreement.

## VII. SETTLEMENT AGREEMENT AND ORDER

28. Based upon the foregoing Findings of Fact, Conclusions of Law, Determinations, and the Administrative Record for this Site, it is hereby Ordered and Agreed that Respondents shall comply with all provisions of this Settlement Agreement, including, but not limited to, all appendices to this Settlement Agreement and all documents incorporated by reference into this Settlement Agreement.

## VIII. DESIGNATION OF CONTRACTORS AND PROJECT COORDINATORS

29. Selection of Contractors, Personnel.

a. All Work performed under this Settlement Agreement shall be under the direction and supervision of qualified personnel. Within 7 days of the Effective Date of this Settlement Agreement, and before the Work outlined below begins, Respondents shall notify U.S. EPA in writing of the names, titles, and qualifications of the personnel, including contractors, subcontractors, consultants and laboratories to be used in carrying out such Work. With respect to any proposed contractor, Respondents shall demonstrate that the proposed contractor has a quality system which complies with ANSI/ASQC E4-1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs," (American National Standard, January 5, 1995), by submitting a copy of the proposed contractor's Quality Management Plan ("QMP"). The QMP should be prepared in accordance with "EPA Requirements for Quality Management Plans (QA/R-2)," (EPA/240/B-01/002, March 2001) or equivalent documentation as determined by U.S. EPA. The qualifications of the persons undertaking the Work for Respondents shall be subject to U.S. EPA's review, for verification that such persons meet minimum technical background and experience requirements. If Respondents fail to demonstrate to U.S. EPA's satisfaction that

9

Respondents are qualified to perform properly and promptly the actions set forth in this Settlement Agreement, U.S. EPA may take over the work required by this Settlement Agreement.

b. If U.S. EPA disapproves in writing of any person(s)' technical qualifications, Respondents shall notify U.S. EPA of the identity and qualifications of the replacement(s) within 14 days of the written notice. If U.S. EPA subsequently disapproves of the replacement(s), U.S. EPA reserves the right to terminate this Settlement Agreement and to conduct a complete RI/FS, and to seek reimbursement for costs and penalties from Respondents. During the course of the RI/FS, Respondents shall notify U.S. EPA in writing of any changes or additions in the personnel used to carry out such Work, providing their names, titles, and qualifications. U.S. EPA shall have the same right to disapprove changes and additions to personnel as it has hereunder regarding the initial notification.

30. Within 7 days after the Effective Date, Respondents shall designate a Project Coordinator who shall be responsible for administration of all actions by Respondents required by this Settlement Agreement and shall submit to U.S. EPA the designated Project Coordinator's name, address, telephone number, and qualifications. To the greatest extent possible, the Project Coordinator shall be present on Site or readily available during Site Work. U.S. EPA retains the right to disapprove of the designated Project Coordinator. If U.S. EPA disapproves of the designated Project Coordinator, Respondents shall retain a different Project Coordinator and shall notify U.S. EPA of that person's name, address, telephone number and qualifications within 14 days following U.S. EPA's disapproval. Respondents shall have the right to change their Project Coordinator subject to U.S. EPA's right to disapprove. Respondents shall notify U.S. EPA three (3) days before such change is made. The initial notification may be made orally, but shall be promptly followed by a written notification.

31. U.S. EPA has designated Karen Cibulskis of the Superfund Division, Region 5 as its Project Coordinator. U.S. EPA will notify Respondents of a change in its designation of the Project Coordinator. Except as otherwise provided in this Settlement Agreement, Respondents shall direct all submissions required by this Settlement Agreement to:

> Ms. Karen Cibulskis
> Remedial Project Manager
> U.S. EPA, Superfund Division
> Mail Code SR-6J
> 77 West Jackson
> Chicago, Illinois 60604-3590

Respondents are encouraged to make their submissions to U.S. EPA on recycled paper (which includes significant post-consumer waste paper content where possible) and using two-sided copies. Respondents shall make submissions electronically according to U.S. EPA Region 5 specifications. Receipt by Respondents' Project Coordinator of any notice or communication from U.S. EPA relating to this Settlement Agreement shall constitute receipt by Respondents. Documents to be submitted to the Respondents shall be sent to:

10

Steve Quigley, P.E.
Principal-in-Charge/Project Manager
Conestoga-Rovers & Associates Ltd.
651 Colby Drive
Waterloo, Ontario N2V 1C2

32. U.S. EPA's Project Coordinator shall have the authority lawfully vested in a Remedial Project Manager ("RPM") and On-Scene Coordinator ("OSC") by the NCP. In addition, U.S. EPA's Project Coordinator shall have the authority consistent with the NCP to halt any Work required by this Settlement Agreement, and to take any necessary response action when s/he determines that conditions at the Site may present an immediate endangerment to public health or welfare or the environment. The absence of the U.S. EPA Project Coordinator from the area under study pursuant to this Settlement Agreement shall not be cause for the stoppage or delay of Work.

33. U.S. EPA and Respondents shall have the right, subject to Paragraph 30, to change their respective Project Coordinator. Respondents shall notify U.S. EPA three (3) days before such a change is made. The initial notification by either party may be made orally, but shall be promptly followed by a written notice.

34. U.S. EPA shall arrange for a qualified person to assist in its oversight and review of the conduct of the RI/FS, as required by Section 104(a) of CERCLA, 42 U.S.C. § 9604(a). Such person shall have the authority to observe Work and make inquiries in the absence of U.S. EPA, but not to modify the RI/FS Planning Documents or other work plans.

## IX. WORK TO BE PERFORMED

35. a. Respondents shall conduct the RI/FS in accordance with the provisions of this Settlement Agreement, the SOW, CERCLA, the NCP, U.S. EPA guidance related to remedial investigations and feasibility studies including, but not limited to: the "Interim Final Guidance for Conducting Remedial Investigations and Feasibility Studies under CERCLA" (OSWER Directive # 9355.3-01); "Guidance for Data Useability in Risk Assessment" (OSWER Directive #9285.7-05); Risk Assessment Guidance for Superfund (RAGS). Volume I - Human Health Evaluation Manual (Part A), Interim Final (EPA-540-1-89-002), OSWER Directive 9285.7-01A, December 1, 1989; and Risk Assessment Guidance for Superfund (RAGS), Volume I - Human Health Evaluation Manual (Part D, Standardized Planning, Reporting, and Review of Superfund Risk Assessments), Interim, (EPA 540-R-97-033), OSWER Directive 9285.7-01D, January 1998; Implementing Presumptive Remedies, U.S. EPA, Office of Emergency and Remedial Response, EPA-540-R-97-029, October 1997; Presumptive Remedy for CERCLA Municipal Landfill Sites, U.S. EPA, OSWER Directive No. 9355.0-49FS, EPA-540-F-93-035, September 1993; Presumptive Remedies: CERCLA Landfill Caps RI/FS Data Collection Guide, U.S. EPA, OSWER Directive 9355.3-18FS, EPA/540/F-95/009, August 1995; Presumptive Response Strategy and Ex-Situ Treatment Technologies for Contaminated Ground Water at CERCLA Sites, OSWER Directive 9283.1-12, EPA-540-R-96-023, October 1996; and any other guidances referenced in the SOW, and any RI/FS related guidance subsequently issued by U.S. EPA.

11

b. In the RI and FS Reports, Respondents shall address the factors required to be taken into account in Section 121 of CERCLA, 42 U.S.C. § 9621, and Section 300.430 of the NCP, 40 C.F.R. § 300.430. The RI shall characterize the geology and hydrogeology of the Site, determine the nature and extent of hazardous substances, pollutants or contaminants at or from the Site, and characterize all ecological zones including terrestrial, riparian, wetlands, aquatic/marine, and transitional. Respondents shall prepare, for inclusion with the RI Report, a determination of the nature and extent of the current and potential threat to the public health or welfare or the environment posed by the release or threatened release of any hazardous substances, pollutants, or contaminants at or from the Site, including a "Baseline Human Health Risk Assessment" and "Baseline Ecological Risk Assessment." In the FS Report, Respondents shall determine and evaluate (based on treatability testing, where appropriate) alternatives for remedial action that protect human health and the environment by recycling waste or by eliminating, reducing and/or controlling risks posed through each pathway at the Site. In the FS Report, the Respondents shall evaluate a range of alternatives including but not limited to those alternatives described in 40 C.F.R. § 300.430(e) and remedial alternatives that utilize permanent solutions and alternative treatment technologies or resource recovery technologies. The FS Reports shall include a detailed analysis of individual alternatives against each of the nine evaluation criteria in 40 C.F.R. § 300.430(e)(9)(iii) and a comparative analysis that focuses upon the relative performance of each alternative against the nine criteria in 40 C.F.R. § 300.430(e)(9)(iii). Respondents shall submit to U.S. EPA and the State six (6) copies of all plans, reports, submittals and other deliverables required under this Settlement Agreement, the SOW and the RI/FS Planning Documents in accordance with the approved schedule for review and approval pursuant to Section X (U.S. EPA Approval of Plans and Other Submissions). All deliverables required by the SOW shall be submitted as directed by the SOW (see Page 2 of the SOW for detailed instructions on this point). Upon request by U.S. EPA, Respondents shall submit in electronic form all portions of RI and FS Reports, any report or other deliverable Respondents are required to submit pursuant to provisions of this Settlement Agreement, including the SOW. Detailed requirements for all reports and deliverables required by the SOW are set forth on page 2 of the SOW. Upon approval by U.S. EPA, all deliverables under this Settlement Agreement, including the SOW, shall be incorporated into and become enforceable under this Settlement Agreement.

36. Community Involvement Plan

U.S. EPA will prepare a Community Involvement Plan, in accordance with U.S. EPA guidance and the NCP. As requested by U.S. EPA, Respondents shall provide information supporting U.S. EPA's community relations programs.

37. Modification of any plans.

a. If at any time during the RI/FS process, Respondents identify a need for additional data, Respondents shall submit a memorandum documenting the need for additional data to the U.S. EPA Project Coordinator within seven (7) days of identification. U.S. EPA in its

12

discretion will determine whether the additional data will be collected by Respondents and whether it will be incorporated into reports and deliverables.

b. In the event of unanticipated or changed circumstances at the Site, Respondents shall notify the U.S. EPA Project Coordinator by telephone within 24 hours of discovery of the unanticipated or changed circumstances. In addition to the authorities in the NCP, in the event that U.S. EPA determines that the immediate threat or the unanticipated or changed circumstances warrant changes in the RI/FS Planning Documents, U.S. EPA shall modify or amend the RI/FS Planning Documents in writing accordingly. Respondents shall perform the RI/FS Planning Documents as modified or amended.

c. U.S. EPA may determine that in addition to tasks defined in the initially approved RI/FS Planning Documents, other additional Work may be necessary to accomplish the objectives of the RI/FS as set forth in the SOW for this RI/FS. U.S. EPA may require that Respondents perform these response actions in addition to those required by the initially approved RI/FS Planning Documents, including any approved modifications, if it determines that such actions are necessary for a complete RI/FS.

d. Respondents shall confirm their willingness to perform the additional Work in writing to U.S. EPA within 7 days of receipt of the U.S. EPA request. If Respondents object to any modification determined by U.S. EPA to be necessary pursuant to this Paragraph, Respondents may seek dispute resolution pursuant to Section XV (Dispute Resolution). The SOW and/or RI/FS Planning Documents shall be modified in accordance with the final resolution of the dispute.

e. Respondents shall complete the additional Work according to the standards, specifications, and schedule set forth or approved by U.S. EPA in a written modification to the RI/FS Planning Documents or written work plan supplement. U.S. EPA reserves the right to conduct the Work itself at any point, to seek reimbursement from Respondents, and/or to seek any other appropriate relief.

f. Nothing in this Paragraph shall be construed to limit U.S. EPA's authority to require performance of further response actions as otherwise provided in this Settlement Agreement.

38. Off-Site Shipment of Waste Material.

a. Respondents shall, prior to any off-site shipment of Waste Material from the Site to an out-of-state waste management facility, provide written notification of such shipment of Waste Material to the appropriate state environmental official in the receiving facility's state and to U.S. EPA's Designated Project Coordinator. However, this notification requirement shall not apply to any off-site shipments when the total volume of all such shipments will not exceed 10 cubic yards.

13

b. Respondents shall include in the written notification the following information: (1) the name and location of the facility to which the Waste Material is to be shipped: (2) the type and quantity of the Waste Material to be shipped; (3) the expected schedule for the shipment of the Waste Material; and (4) the method of transportation. Respondents shall notify the state in which the planned receiving facility is located of major changes in the shipment plan, such as a decision to ship the Waste Material to another facility within the same state, or to a facility in another state.

c. The identity of the receiving facility and state will be determined by Respondents following the award of the contract for the remedial investigation and feasibility study. Respondents shall provide the information required by Subparagraph 38.b and 38.d as soon as practicable after the award of the contract and before the Waste Material is actually shipped.

d. Before shipping any hazardous substances, pollutants, or contaminants from the Site to an off-site location, Respondents shall obtain U.S. EPA's certification that the proposed receiving facility is operating in compliance with the requirements of CERCLA Section 121(d)(3), 42 U.S.C. § 9621(d)(3), and 40 C.F.R. § 300.440. Respondents shall only send hazardous substances, pollutants, or contaminants from the Site to an off-site facility that complies with the requirements of the statutory provision and regulation cited in the preceding sentence.

39. Meetings. Respondents shall make presentations at, and participate in, meetings at the request of U.S. EPA during the initiation, conduct, and completion of the RI/FS. In addition to discussion of the technical aspects of the RI/FS, topics will include anticipated problems or new issues. Meetings will be scheduled at U.S. EPA's discretion.

40. Progress Reports. In addition to the deliverables set forth in this Settlement Agreement, Respondents shall provide to U.S. EPA monthly progress reports by the 10th day of the following month. At a minimum, with respect to the preceding month, these progress reports shall (1) describe the actions which have been taken to comply with this Settlement Agreement during that month, (2) include hard copies and electronic copies (according to U.S. EPA Region 5 specifications) of all results of sampling and tests and all other data received by the Respondents (3) describe Work planned for the next two months with schedules relating such Work to the overall project schedule for RI/FS completion, and (4) describe all problems encountered and any anticipated problems, any actual or anticipated delays, and solutions developed and implemented to address any actual or anticipated problems or delays.

41. Emergency Response and Notification of Releases.

a. In the event of any action or occurrence during performance of the Work which causes or threatens a release of Waste Material from the Site that constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment, Respondents shall immediately take all appropriate action. Respondents shall take these actions in accordance

14

with all applicable provisions of this Settlement Agreement, including, but not limited to, the Health and Safety Plan, in order to prevent, abate or minimize such release or endangerment caused or threatened by the release. Respondents shall also immediately notify the U.S. EPA Project Coordinator or, in the event of his/her unavailability, the On Scene Coordinator ("OSC") or the Regional Duty Officer, U.S. EPA Region 5 Emergency Planning and Response Branch at (Tel: (312) 353-2318) of the incident or Site conditions. In the event that Respondents fail to take appropriate response action as required by this Paragraph, and U.S. EPA takes such action instead, Respondents shall reimburse U.S. EPA all costs of the response action not inconsistent with the NCP pursuant to Section XVIII (Payment of Response Costs).

b. In addition, in the event of any release of a hazardous substance from the Site, Respondents shall immediately notify the U.S. EPA Project Coordinator, the OSC or Regional Duty Officer at (312) 353-2318 and the National Response Center at (800) 424-8802. Respondents shall submit a written report to U.S. EPA within 7 days after each release, setting forth the events that occurred and the measures taken or to be taken to mitigate any release or endangerment caused or threatened by the release and to prevent the reoccurrence of such a release. This reporting requirement is in addition to, and not in lieu of, reporting under Section 103(c) of CERCLA, 42 U.S.C. § 9603(c), and Section 304 of the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. § 11004, *et seq.*

## X. U.S. EPA APPROVAL OF PLANS AND OTHER SUBMISSIONS

42. After review of any plan, report or other item that is required to be submitted for approval pursuant to this Settlement Agreement, including the SOW, U.S. EPA shall: (a) approve, in whole or in part, the submission; (b) approve the submission upon specified conditions; (c) modify the submission to cure the deficiencies; (d) disapprove, in whole or in part, the submission, directing that Respondents modify the submission; or (e) any combination of the above. However, U.S. EPA shall not modify a submission without first providing Respondents at least one notice of deficiency and an opportunity to cure within 21 days, except where to do so would cause serious disruption to the Work or where previous submission(s) have been disapproved due to material defects.

43. In the event of approval, approval upon conditions, or modification by U.S. EPA, pursuant to Subparagraph 42(a), (b), (c) or (e), Respondents shall proceed to take any action required by the plan, report or other item, as approved or modified by U.S. EPA subject only to their right to invoke the Dispute Resolution procedures set forth in Section XV (Dispute Resolution) with respect to the modifications or conditions made by U.S. EPA. Following U.S. EPA approval or modification of a submittal or portion thereof, Respondents shall not thereafter alter or amend such submittal or portion thereof unless directed by U.S. EPA. In the event that U.S. EPA modifies the submission to cure the deficiencies pursuant to Subparagraph 42(c) and the submission had a material defect, U.S. EPA retains the right to seek stipulated penalties, as provided in Section XVI (Stipulated Penalties). U.S. EPA also retains the right to perform its own studies, complete the RI/FS (or any portion of the RI/FS), and seek reimbursement from Respondents for its costs; and/or seek any other appropriate relief.

15

44. Resubmission of Plans.

    a. Upon receipt of a notice of disapproval, Respondents shall, within 15 days or such longer time as specified by U.S. EPA in such notice, correct the deficiencies and resubmit the plan, report, or other item for approval. Any stipulated penalties applicable to the submission, as provided in Section XVI, shall accrue during the 15-day period or otherwise specified period but shall not be payable unless the resubmission is disapproved or modified due to a material defect as provided in Paragraphs 45 and 46.

    b. Notwithstanding the receipt of a notice of disapproval, Respondents shall proceed to take any action required by any non-deficient portion of the submission unless otherwise directed by U.S. EPA. Implementation of any non-deficient portion of a submission shall not relieve Respondents of any liability for stipulated penalties under Section XVI (Stipulated Penalties).

    c. Respondents shall not proceed further with any subsequent activities or tasks until receiving U.S. EPA approval for the following deliverables: RI/FS Work Plan/Field Sampling Plan, Quality Assurance Project Plan, Draft Remedial Investigation Report, Treatability Testing Work Plan and Sampling and Analysis Plan, and Draft Feasibility Study Report. While awaiting U.S. EPA approval on these deliverables, Respondents shall proceed with all other tasks and activities which may be conducted independently of these deliverables, in accordance with the schedule set forth in this Settlement Agreement.

    d. For all remaining deliverables not enumerated above in subparagraph 44.c., Respondents shall proceed will all subsequent tasks, activities and deliverables without awaiting U.S. EPA approval on the submitted deliverable. U.S. EPA reserves the right to stop Respondents from proceeding further, either temporarily or permanently, on any task, activity or deliverable at any point during the RI/FS.

    45. If U.S. EPA disapproves a resubmitted plan, report or other item, or portion thereof, U.S. EPA may direct Respondents to correct the deficiencies. U.S. EPA also retains the right to modify or develop the plan, report or other item. Respondents shall implement any such plan, report, or item as corrected, modified or developed by U.S. EPA, subject only to their right to invoke the procedures set forth in Section XV (Dispute Resolution).

    46. If upon resubmission, a plan, report, or item is disapproved or modified by U.S. EPA due to a material defect, Respondents shall be deemed to have failed to submit such plan, report, or item timely and adequately unless Respondents invoke the dispute resolution procedures in accordance with Section XV (Dispute Resolution) and U.S. EPA's action is revoked or substantially modified pursuant to a Dispute Resolution decision issued by U.S. EPA or superceded by an agreement reached pursuant to that Section. The provisions of Section XV (Dispute Resolution) and Section XVI (Stipulated Penalties) shall govern the implementation of the Work and accrual and payment of any stipulated penalties during Dispute Resolution. If U.S. EPA's disapproval or modification is not otherwise revoked, substantially modified or

16

superceded as a result of a decision or agreement reached pursuant to the Dispute Resolution process set forth in Section XV, stipulated penalties shall accrue for such violation from the date on which the initial submission was originally required, as provided in Section XVI.

47. In the event that U.S. EPA takes over some of the tasks, but not the preparation of the RI Report or the FS Report, Respondents shall incorporate and integrate information supplied by U.S. EPA into the final reports.

48. All plans, reports, and other items submitted to U.S. EPA under this Settlement Agreement shall, upon approval or modification by U.S. EPA, be incorporated into and enforceable under this Settlement Agreement. In the event U.S. EPA approves or modifies a portion of a plan, report, or other item submitted to U.S. EPA under this Settlement Agreement, the approved or modified portion shall be incorporated into and enforceable under this Settlement Agreement.

49. Neither failure of U.S. EPA to expressly approve or disapprove of Respondents' submissions within a specified time period, nor the absence of comments, shall be construed as approval by U.S. EPA. Whether or not U.S. EPA gives express approval for Respondents' deliverables, Respondents are responsible for preparing deliverables acceptable to U.S. EPA.

## XI. QUALITY ASSURANCE, SAMPLING AND DATA AVAILABILITY

50. Quality Assurance. Respondents shall assure that Work performed, samples taken and analyses conducted conform to the requirements of the SOW, the QAPP and guidances identified therein. Respondents will assure that field personnel used by Respondents are properly trained in the use of field equipment and in chain of custody procedures. Respondents shall only use laboratories which have a documented quality system that complies with "EPA Requirements for Quality Management Plans (QA/R-2)" (EPA/240/B-01/002, March 2001) or equivalent documentation as determined by U.S. EPA.

51. Sampling.

a. All results of sampling, tests, modeling or other data (including raw data) generated by Respondents, or on Respondents' behalf, during the period that this Settlement Agreement is effective, shall be submitted to U.S. EPA (in paper and electronic form according to U.S. EPA Region 5 specifications) in the next monthly progress report as described in Paragraph 40 of this Settlement Agreement. U.S. EPA will make available to Respondents validated data generated by U.S. EPA unless it is exempt from disclosure by any federal or state law or regulation.

b. Respondents shall verbally notify U.S. EPA, and the State at least 15 days prior to conducting any field events as described in the SOW and RI/FS Work Plan/Field Sampling Plan. At U.S. EPA's verbal or written request, or the request of U.S. EPA's oversight assistant, Respondents shall allow split or duplicate samples to be taken by U.S. EPA (and its authorized

17

representatives) and the State, of any samples collected by Respondents in implementing this Settlement Agreement. All split samples of Respondents shall be analyzed by the methods identified in the QAPP.

52. <u>Data Availability</u>.

a. At all reasonable times, U.S. EPA and its authorized representatives shall have the authority to enter and freely move about all property at the Site and off-site areas where Work, if any, is being performed, for the purposes of inspecting conditions, activities, the results of activities, records, operating logs, and contracts related to the Site or Respondents and its contractor pursuant to this Settlement Agreement; reviewing the progress of Respondents in carrying out the terms of this Settlement Agreement; conducting tests as U.S. EPA or its authorized representatives deem necessary; using a camera, sound recording device or other documentary type equipment; and verifying the data submitted to U.S. EPA by Respondents. Respondents shall allow these persons to inspect and copy all records, files, photographs, documents, sampling and monitoring data, and other writings related to Work undertaken in carrying out this Settlement Agreement. Nothing herein shall be interpreted as limiting or affecting U.S. EPA's right of entry or inspection authority under federal law. All persons accessing the Site under this paragraph shall comply with all approved Health and Safety Plans.

b. Respondents may assert business confidentiality claims covering part or all of the documents or information submitted to U.S. EPA and the State under this Settlement Agreement to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA. 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). Documents or information determined to be confidential by U.S. EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies documents or information when it is submitted to U.S. EPA and the State, or if U.S. EPA has notified Respondents that the documents or information are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such documents or information without further notice to Respondents. Respondents agree not to assert confidentiality claims with respect to any data related to Site conditions, sampling, or monitoring. Respondents shall segregate and clearly identify all documents or information submitted under this Settlement Agreement for which Respondents assert business confidentiality claims.

53. In entering into this Settlement Agreement, Respondents waive any objections to any data gathered, generated, or evaluated by U.S. EPA, the State or Respondents in the performance or oversight of the Work that has been verified according to the quality assurance/quality control (QA/QC) procedures required by the Settlement Agreement or any U.S. EPA-approved Work Plans or Sampling and Analysis Plans. If Respondents object to any other data relating to the RI/FS, Respondents shall submit to U.S. EPA a report that specifically identifies and explains their objections, describes the acceptable uses of the data, if any, and identifies any limitations to the use of the data. The report must be submitted to U.S. EPA within 15 days of the monthly progress report containing the data.

18

## XII. SITE ACCESS AND INSTITUTIONAL CONTROLS

54. If the Site, or any other property where access is needed to implement this Settlement Agreement, is owned or controlled by any of Respondents, such Respondents shall, commencing on the Effective Date, provide U.S. EPA ,the State, and their representatives, including contractors, with access at all reasonable times to the Site, or such other property, for the purpose of conducting any activity related to this Settlement Agreement.

55. Where any action under this Settlement Agreement is to be performed in areas owned by or in possession of someone other than Respondents, Respondents shall use their best efforts to obtain all necessary access agreements within 15 days after the Effective Date, or as otherwise specified in writing by the U.S. EPA Project Coordinator. Respondents shall immediately notify U.S. EPA if after using their best efforts they are unable to obtain such agreements. For purposes of this Paragraph, "best efforts" includes the payment of reasonable sums of money in consideration of access. Respondents shall describe in writing their efforts to obtain access. U.S. EPA may then assist Respondents in gaining access, to the extent necessary to effectuate the response actions described herein, using such means as U.S. EPA deems appropriate. Respondents shall reimburse U.S. EPA for all costs and attorney's fees incurred by the United States in obtaining such access, in accordance with the procedures in Section XVIII (Payment of Response Costs).

56. Notwithstanding any provision of this Settlement Agreement, U.S. EPA retains all of its access authorities and rights, as well as all of its rights to require land/water use restrictions, including enforcement authorities related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

57. If Respondents cannot obtain access agreements, U.S. EPA may obtain access for Respondents, perform those tasks or activities with U.S. EPA contractors, or terminate the Settlement Agreement. In the event that U.S. EPA performs those tasks or activities with U.S. EPA contractors and does not terminate the Settlement Agreement, Respondents shall perform all other activities not requiring access to that property, and shall reimburse U.S. EPA for all costs incurred in performing such activities. Respondents shall integrate the results of any such tasks undertaken by U.S. EPA into its reports and deliverables.

## XIII. COMPLIANCE WITH OTHER LAWS

58. Respondents shall comply with all applicable local, state and federal laws and regulations when performing the RI/FS. No local, state, or federal permit shall be required for any portion of any action conducted entirely on-site, including studies, if the action is selected and carried out in compliance with Section 121 of CERCLA, 42 U.S.C. § 9621. Where any portion of the Work is to be conducted off-site and requires a federal or state permit or approval, Respondents shall submit timely and complete applications and take all other actions necessary to obtain and to comply with all such permits or approvals. This Settlement Agreement is not,

19

and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

## XIV.  RETENTION OF RECORDS

59.  During the pendency of this Settlement Agreement and for a minimum of 10 years after commencement of construction of any remedial action, each Respondent shall preserve and retain all non-identical copies of records and documents (including records or documents in electronic form) now in its possession or control or which come into its possession or control that relate in any manner to the performance of the Work or the liability of any person under CERCLA with respect to the Site, regardless of any corporate retention policy to the contrary. Until 10 years after commencement of construction of any remedial action, Respondents shall also instruct their contractors and agents to preserve all documents, records, and information of whatever kind, nature or description relating to performance of the Work.

60.  At the conclusion of this document retention period, Respondents shall notify U.S. EPA at least 90 days prior to the destruction of any such records or documents, and, upon request by U.S. EPA, Respondents shall deliver any such records or documents to U.S. EPA. Respondents may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law.  If Respondents assert such a privilege, they shall provide U.S. EPA with the following:  1) the title of the document, record, or information; 2) the date of the document, record, or information; 3) the name and title of the author of the document, record, or information; 4) the name and title of each addressee and recipient; 5) a description of the subject of the document, record, or information; and 6) the privilege asserted by Respondents.  However, no documents, reports or other information created or generated pursuant to the requirements of this Settlement Agreement shall be withheld on the grounds that they are privileged.

61.  Each Respondent hereby certifies individually that to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed or otherwise disposed of any records, documents or other information (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by U.S. EPA or the filing of suit against it regarding the Site and that it has fully complied with any and all U.S. EPA requests for information pursuant to Sections 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e), and Section 3007 of RCRA, 42 U.S.C. § 6927.

## XV.  DISPUTE RESOLUTION

62.  Unless otherwise expressly provided for in this Settlement Agreement, the dispute resolution procedures of this Section shall be the exclusive mechanism for resolving disputes arising under this Settlement Agreement.  The Parties shall attempt to resolve any disagreements concerning this Settlement Agreement expeditiously and informally.

63. If Respondents object to any U.S. EPA action taken pursuant to this Settlement Agreement, including billings for Future Response Costs, they shall notify U.S. EPA in writing of their objection(s) within 10 days of such action, unless the objection(s) has/have been resolved informally. U.S. EPA and Respondents shall have 20 days from U.S. EPA's receipt of Respondents' written objection(s) to resolve the dispute (the "Negotiation Period"). The Negotiation Period may be extended at the sole discretion of U.S. EPA. Such extension may be granted verbally but must be confirmed in writing to be effective.

64. Any agreement reached by the Parties pursuant to this Section shall be in writing and shall, upon signature by the Parties, be incorporated into and become an enforceable part of this Settlement Agreement. If the Parties are unable to reach an agreement within the Negotiation Period, an U.S. EPA management official at the Superfund Branch Chief level or higher will issue a written decision. U.S. EPA's decision shall be incorporated into and become an enforceable part of this Settlement Agreement. Respondents' obligations under this Settlement Agreement shall not be tolled by submission of any objection for dispute resolution under this Section. Following resolution of the dispute, as provided by this Section, Respondents shall fulfill the requirement that was the subject of the dispute in accordance with the agreement reached or with U.S. EPA's decision, whichever occurs. Respondents shall proceed in accordance with U.S. EPA's final decision regarding the matter in dispute, regardless of whether Respondents agree with the decision. If Respondents do not agree to perform or do not actually perform the Work in accordance with U.S. EPA's final decision, U.S. EPA reserves the right in its sole discretion to conduct the Work itself, to seek reimbursement from Respondents, to seek enforcement of the decision, to seek stipulated penalties, and/or to seek any other appropriate relief.

## XVI. STIPULATED PENALTIES

65. Respondents shall be liable to U.S. EPA for stipulated penalties in the amounts set forth in Paragraphs 66 and 67 for failure to comply with any of the requirements of this Settlement Agreement specified below unless excused under Section XVII (Force Majeure). "Compliance" by Respondents shall include completion of the Work under this Settlement Agreement or any activities contemplated under any of the RI/FS Planning Documents, work plans or other plan approved under this Settlement Agreement identified below in accordance with all applicable requirements of law, this Settlement Agreement, the SOW, and any plans or other documents approved by U.S. EPA pursuant to this Settlement Agreement and within the specified time schedules established by and approved under this Settlement Agreement.

66. Stipulated Penalty Amounts - Work.

    a. The following stipulated penalties shall accrue per day for any noncompliance identified in Subparagraph 66(b):

21

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,000.00 | 1st through 21st day |
| $2000.00 | 22$^{d}$ through 30th day |
| $3000.00 | 31st day and beyond |

b. Compliance Milestones:

- Timely notification to U.S. EPA in writing of names, titles and qualification of the personnel, including contractors, subcontractors, consultants, and laboratories to be used in carrying out the Work [Paragraph 29(a) and (b)].

- Submission to U.S. EPA of Respondent's designated Project Coordinator's name, address, telephone number and qualifications [Paragraph 30].

- Conduct site characterization activities as described in the SOW and RI/FS Work Plan/Field Sampling Plan [Paragraph 35].

- Prepare Technical Assistance Plan [Paragraph 36].

- Submission of Memorandum documenting need for additional data collection activities identified by Respondents [Paragraph 37(a)].

- Provide written commitment of willingness to perform additional Work identified by U.S. EPA [Paragraph 37(d)].

- Provide copy of written notification to U.S. EPA of off-site shipment of Waste Material from the Site to an out-of-state waste management facility [Paragraph 38].

- Monthly Progress Reports [Paragraph 40].

- Written report due in the event of any release of a hazardous substance from the Site [Paragraph 40(b)].

- Report objecting to RI/FS data [Paragraph 53].

- Provide written description of failed efforts to obtain access [Paragraph 55].

- Payment of Future Response Costs [Paragraph 79].

- Establish escrow account in the event of any dispute over billing.

22

67.  Stipulated Penalty Amounts - RI/FS Planning Documents, Reports and Technical Memoranda

      a.  The following stipulated penalties shall accrue per violation per day for failure to submit timely or adequate plans, reports, technical memoranda or other written documents required by Tasks 1 through 7 of the SOW in accordance with the Schedule in the SOW:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,000 | 1st through 21st day |
| $2,000 | 22d through 30th day |
| $3,000 | 31st day and beyond |

68.  Respondents shall be liable for stipulated penalties in the amount of $500.00 per day for the first week or part thereof and $1,000.00 per day for each week or part thereof thereafter for failure to meet any other obligation under this Settlement Agreement including the SOW.

69.  All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs, and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity.  However, stipulated penalties shall not accrue: (1) with respect to a deficient submission under Section X (U.S. EPA Approval of Plans and Other Submissions), during the period, if any, beginning on the 31st day after U.S. EPA's receipt of such submission until the date that U.S. EPA notifies Respondents of any deficiency; and (2)  with respect to a decision by the U.S. EPA Management Official at the Superfund Branch Chief level or higher, under Paragraph 64 of Section XV (Dispute Resolution), during the period, if any, beginning on the 21st day after the Negotiation Period begins until the date that the U.S. EPA management official issues a final decision regarding such dispute.  Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Settlement Agreement.

70.  Following U.S. EPA's determination that Respondents have failed to comply with a requirement of this Settlement Agreement, U.S. EPA may give Respondents written notification of the same and describe the noncomp
liance.  U.S. EPA may send Respondents a written demand for the payment of the penalties.  However, penalties shall accrue as provided in the preceding Paragraph regardless of whether U.S. EPA has notified Respondents of a violation.

71.  All penalties accruing under this Section shall be due and payable to U.S. EPA within 30 days of Respondents' receipt from U.S. EPA of a demand for payment of the penalties, unless Respondents invoke the dispute resolution procedures in accordance with Section XV (Dispute Resolution).  All payments to U.S. EPA under this Section shall be paid by certified or

23

cashier's check(s) made payable to "EPA Hazardous Substances Superfund," shall be mailed to U.S. EPA, Region 5, P. O. Box 371531, Pittsburgh, PA 15251-7531, shall indicate that the payment is for stipulated penalties, and shall reference the U.S. EPA Region and Site/Spill ID Number B52B, the U.S. EPA Docket Number V-W-'06-C-852, and the name and address of the party(ies) making payment. Copies of check(s) paid pursuant to this Section, and any accompanying transmittal letter(s) shall be sent to:

| | |
|---|---|
| Thomas C. Nash | Karen Cibulskis |
| Site Attorney | Remedial Project Manager |
| Office of Regional Counsel | Superfund Division |
| Mail Code C-14J | Mail Code SR-6J |
| 77 West Jackson | 77 West Jackson |
| Chicago, IL 60604-3590 | Chicago, IL 60604-3590 |

72. The payment of penalties shall not alter in any way Respondents' obligation to complete performance of the Work required under this Settlement Agreement.

73. Penalties shall continue to accrue as provided in Paragraph 69 during any dispute resolution period, but need not be paid until 15 days after the dispute is resolved by agreement or by receipt of U.S. EPA's decision.

74. If Respondents fail to pay stipulated penalties when due, U.S. EPA may institute proceedings to collect the penalties, as well as Interest. Respondents shall pay Interest on the unpaid balance, which shall begin to accrue on the date of demand made pursuant to Paragraph 71.

75. Nothing in this Settlement Agreement shall be construed as prohibiting, altering, or in any way limiting the ability of U.S. EPA to seek any other remedies or sanctions available by virtue of Respondents' violation of this Settlement Agreement or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Section 122(l) of CERCLA, 42 U.S.C. § 9622(l), and punitive damages pursuant to Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3). Provided, however, that U.S. EPA shall not seek civil penalties pursuant to Section 122(l) of CERCLA or punitive damages pursuant to Section 107(c)(3) of CERCLA for any violation for which a stipulated penalty is provided herein, except in the case of willful violation of this Settlement Agreement or in the event that U.S. EPA assumes performance of a portion or all of the Work pursuant to Section XX (Reservation of Rights by U.S. EPA), Paragraph 86. Notwithstanding any other provision of this Section, U.S. EPA may, in its sole and unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this Settlement Agreement.

## XVII. FORCE MAJEURE

76. Respondents agree to perform all requirements of this Settlement Agreement within the time limits established under this Settlement Agreement, unless the performance is delayed by a *force majeure*. For purposes of this Settlement Agreement, *force majeure* is defined as any event arising from causes beyond the control of Respondents or of any entity controlled by Respondents, including but not limited to their contractors and subcontractors, which delays or prevents performance of any obligation under this Settlement Agreement despite Respondents' best efforts to fulfill the obligation. *Force majeure* does not include financial inability to complete the Work or increased cost of performance.

77. If any event occurs or has occurred that may delay the performance of any obligation under this Settlement Agreement, whether or not caused by a *force majeure* event, Respondents shall notify U.S. EPA orally within twenty four hours of when Respondents first knew that the event might cause a delay. Within five (5) days thereafter, Respondents shall provide to U.S. EPA in writing an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Respondents' rationale for attributing such delay to a *force majeure* event if they intend to assert such a claim; and a statement as to whether, in the opinion of Respondents, such event may cause or contribute to an endangerment to public health, welfare or the environment. Failure to comply with the above requirements shall preclude Respondents from asserting any claim of *force majeure* for that event for the period of time of such failure to comply and for any additional delay caused by such failure.

78. If U.S. EPA agrees that the delay or anticipated delay is attributable to a *force majeure* event, the time for performance of the obligations under this Settlement Agreement that are affected by the *force majeure* event will be extended by U.S. EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the *force majeure* event shall not, of itself, extend the time for performance of any other obligation. If U.S. EPA does not agree that the delay or anticipated delay has been or will be caused by a *force majeure* event, U.S. EPA will notify Respondents in writing of its decision. If U.S. EPA agrees that the delay is attributable to a *force majeure* event, U.S. EPA will notify Respondents in writing of the length of the extension, if any, for performance of the obligations affected by the *force majeure* event.

## XVIII. PAYMENT OF RESPONSE COSTS

79. Payments for Future Response Costs.

a. Respondents shall pay U.S. EPA all Future Response Costs not inconsistent with the NCP. On a periodic basis, U.S. EPA will send Respondents a bill requiring payment that includes Region 5's Itemized Cost Summary, which includes direct and indirect costs

25

incurred by U.S. EPA and its contractors. If the U.S. Department of Justice has incurred costs for this Site, the bill will also include a DOJ-prepared cost summary, which would reflect costs incurred by DOJ and its contractors, if any. Respondents shall make all payments within 30 days of receipt of each bill requiring payment, except as otherwise provided in this Settlement Agreement. Respondents shall make all payments required by this Paragraph by a certified or cashier's check or checks made payable to "EPA Hazardous Substance Superfund," referencing the name and address of the party(ies) making payment and U.S. EPA Site/Spill ID number B52B. Respondents shall send the check(s) to:

> U.S. Environmental Protection Agency, Region 5
> P. O. Box 371531,
> Pittsburgh, PA 15251-7531

Payment made pursuant to this paragraph may also be made to U.S. EPA by Electronics Funds Transfer ("EFT") in accordance with current EFT procedures to be provided to Respondents by U.S. EPA Region 5, and shall be accompanied by a statement identifying the name and address of the party(ies) making payment, the Site name, the U.S. EPA Region and Site/Spill ID Number B52B, and the U.S. EPA docket number for this action. Region 5 EFT procedures are: make payment to:

> Federal Reserve Bank of New York
> ABA No. 021030004
> Account No. 68010727
> 33 Liberty Street
> New York, NY 10045

Field Tag 4200 of the Fedwire message is: "D 68010727 Environmental Protection Agency."

Respondents shall: 1) complete Respondents' required bank form; 2) include Federal Reserve Bank of New York ABA # 021030004 on the bank form; 3) include the U.S. EPA Account # 68010727 on the form; and 4) include a statement identifying the name and address of the party(ies) making payment, the Site name, and the U.S. EPA Region and Site/Spill ID Number B52B.

b. At the time of payment, Respondents shall send notice that payment has been made to:

| | |
|---|---|
| Thomas C. Nash | Karen Cibulskis |
| Site Attorney | Remedial Project Manager |
| Office of Regional Counsel | Superfund Division |
| Mail Code C-14J | Mail Code SR-6J |
| 77 West Jackson | 77 West Jackson |
| Chicago, IL 60604-3590 | Chicago, IL 60604-3590 |

c. The total amount to be paid by Respondents pursuant to Subparagraph 79.a. shall be deposited in the South Dayton Dump and Landfill Site Special Account within the U.S. EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by U.S. EPA to the U.S. EPA Hazardous Substance Superfund.

80. If Respondents do not pay Future Response Costs within 30 days of Respondents' receipt of a bill, Respondents shall pay Interest on the unpaid balance of Future Response Costs. The Interest on unpaid Future Response Costs shall begin to accrue on the date of the bill and shall continue to accrue until the date of payment. If U.S. EPA receives a partial payment, Interest shall accrue on any unpaid balance. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to the United States by virtue of Respondents' failure to make timely payments under this Section, including but not limited to, payments of stipulated penalties pursuant to Section XVI. Respondents shall make all payments required by this Paragraph in the manner described in Paragraph 79.

81. Respondents may contest payment of any Future Response Costs under Paragraph 79 if they determine that U.S. EPA has made an accounting error or if they believe U.S. EPA incurred excess costs as a direct result of an U.S. EPA action that was inconsistent with the NCP. Such objection shall be made in writing within 30 days of receipt of the bill and must be sent to the U.S. EPA Project Coordinator. Any such objection shall specifically identify the contested Future Response Costs and the basis for objection. In the event of an objection, Respondents shall within the 30 day period pay all uncontested Future Response Costs to U.S. EPA in the manner described in Paragraph 79. Simultaneously, Respondents shall establish an interest-bearing escrow account in a federally-insured bank duly chartered in the State of Ohio and remit to that escrow account funds equivalent to the amount of the contested Future Response Costs. Respondents shall send to the U.S. EPA Project Coordinator a copy of the transmittal letter and check paying the uncontested Future Response Costs, and a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account. Simultaneously with establishment of the escrow account, Respondents shall initiate the Dispute Resolution procedures in Section XV (Dispute Resolution). If U.S. EPA prevails in the dispute, within 5 days of the resolution of the dispute, Respondents shall pay the sums due (with accrued interest) to U.S. EPA in the manner described in Paragraph 79. If Respondents prevail concerning any aspect of the contested costs, Respondents shall pay that portion of the costs (plus associated accrued interest) for which they did not prevail to U.S. EPA in the manner described in Paragraph 79. Respondents shall be disbursed any balance of the escrow account. The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XV (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding Respondents' obligation to reimburse U.S. EPA for its Future Response Costs.

## XIX. COVENANT NOT TO SUE BY U.S. EPA

82. In consideration of the actions that will be performed and the payments that will be made by Respondents under the terms of this Settlement Agreement, and except as otherwise specifically provided in this Settlement Agreement, U.S. EPA covenants not to sue or to take administrative action against Respondents pursuant to Sections 106 and 107(a) of CERCLA, 42 U.S.C. §§ 9606 and 9607(a), for the Work and Future Response Costs. This covenant not to sue shall take effect upon the Effective Date and is conditioned upon the complete and satisfactory performance by Respondents of all obligations under this Settlement Agreement, including, but not limited to, payment of Future Response Costs pursuant to Section XVIII. This covenant not to sue extends only to Respondents and does not extend to any other person.

## XX. RESERVATIONS OF RIGHTS BY U.S. EPA

83. Except as specifically provided in this Settlement Agreement, nothing herein shall limit the power and authority of U.S. EPA or the United States to take, direct, or order all actions necessary to protect public health, welfare, or the environment or to prevent, abate, or minimize an actual or threatened release of hazardous substances, pollutants or contaminants, or hazardous or solid waste on, at, or from the Site. Further, nothing herein shall prevent U.S. EPA from seeking legal or equitable relief to enforce the terms of this Settlement Agreement, from taking other legal or equitable action as it deems appropriate and necessary, or from requiring Respondents in the future to perform additional activities pursuant to CERCLA or any other applicable law.

84. The covenant not to sue set forth in Section XIX above does not pertain to any matters other than those expressly identified therein. U.S. EPA reserves, and this Settlement Agreement is without prejudice to, all rights against Respondents with respect to all other matters, including, but not limited to:

> a. claims based on a failure by Respondents to meet a requirement of this Settlement Agreement;
>
> b. liability for costs not included within the definitions of Future Response Costs;
>
> c. liability for performance of response action other than the Work;
>
> d. criminal liability;
>
> e. liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;
>
> f. liability arising from the past, present, or future disposal, release or threat of release of Waste Materials outside of the Site; and

28

    g. liability for costs incurred or to be incurred by the Agency for Toxic Substances and Disease Registry related to the Site.

    h. liability for costs incurred if U.S. EPA assumes the performance of the Work pursuant to paragraph 85.

    85. <u>Work Takeover</u>. In the event U.S. EPA determines that Respondents have ceased implementation of any portion of the Work, are deficient or late in their performance of the Work, or are implementing the Work in a manner which may cause an endangerment to human health or the environment, U.S. EPA may assume the performance of all or any portion of the Work as U.S. EPA determines necessary. Respondents may invoke the procedures set forth in Section XV (Dispute Resolution) to dispute U.S. EPA's determination that takeover of the Work is warranted under this Paragraph. Notwithstanding any other provision of this Settlement Agreement, U.S. EPA retains all authority and reserves all rights to take any and all response actions authorized by law.

## XXI.  COVENANT NOT TO SUE BY RESPONDENTS

    86. Respondents covenant not to sue and agree not to assert any claims or causes of action against the United States, or its contractors or employees, with respect to the Work, Future Response Costs, or this Settlement Agreement, including, but not limited to:

    a. any direct or indirect claim for reimbursement from the Hazardous Substance Superfund established by 26 U.S.C. § 9507, based on Sections 106(b)(2), 107, 111, 112, or 113 of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other provision of law;

    b. any claim arising out of the Work or arising out of the response actions for which the Future Response Costs have or will be incurred, including any claim under the United States Constitution, the Ohio Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, as amended, or at common law; or

    c. any claim against the United States pursuant to Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and 9613, relating to the Work or payment of Future Response Costs.

    87. Except as provided in Paragraph 91, these covenants not to sue shall not apply in the event the United States brings a cause of action or issues an order pursuant to the reservations set forth in Paragraphs 84 (b), (c), and (e) - (g), but only to the extent that Respondents' claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

29

88. Nothing in this Agreement shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

89. **AGREEMENT NOT TO CHALLENGE LISTING.** Respondents agree not to seek judicial review of a decision to list the Site on the NPL at any time after the Effective Date of this Settlement Agreement based on a claim that changed site conditions that resulted from the performance of the Work in any way affected the basis for listing the Site.

90. **WAIVER OF CLAIMS AGAINST DE MICROMIS PARTIES.** Respondents agree not to assert any claims and to waive all claims or causes of action that they may have for all matters relating to the Site, including for contribution, against any person where the person's liability to Respondents with respect to the Site is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at the Site, or having accepted for transport for disposal or treatment of hazardous substances at the Site, if all or part of the disposal, treatment, or transport occurred before April 1, 2001, and the total amount of material containing hazardous substances contributed by such person to the Site was less than 110 gallons of liquid materials or 200 pounds of solid materials.

91. The waiver in Paragraph 90 shall not apply with respect to any defense, claim, or cause of action that a Respondent may have against any person meeting the above criteria if such person asserts a claim or cause of action relating to the Site against such Respondent. This waiver also shall not apply to any claim or cause of action against any person meeting the above criteria if U.S. EPA determines:

a. that such person has failed to comply with any U.S. EPA requests for information or administrative subpoenas issued pursuant to Section 104(e) or 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) or 9622(e), or Section 3007 of the Solid Waste Disposal Act (also known as the Resource Conservation and Recovery Act or "RCRA"), 42 U.S.C. § 6972, or has impeded or is impeding, through action or inaction, the performance of a response action or natural resource restoration with respect to the Site, or has been convicted of a criminal violation for the conduct to which this waiver would apply and that conviction has not been vitiated on appeal or otherwise; or

b. that the materials containing hazardous substances contributed to the Site by such person have contributed significantly, or could contribute significantly, either individually or in the aggregate, to the cost of response action or natural resource restoration at the Site.]

92. **NATURAL RESOURCE DAMAGES.** For the purposes of Section 113(g)(1) of CERCLA, the parties agree that, upon issuance of this Settlement Agreement, remedial action under CERCLA shall be deemed to be scheduled and an action for damages (as defined in 42 U.S.C. § 9601(6)) must be commenced within 3 years after the completion of the remedial action.

## XXII. OTHER CLAIMS

93.  By issuance of this Settlement Agreement, the United States and U.S. EPA assume no liability for injuries or damages to persons or property resulting from any acts or omissions of Respondents.

94.  Except as expressly provided in Section XXI, Paragraph 90, (Non-Exempt De Micromis Waivers) and Section XIX (Covenant Not to Sue by U.S. EPA), nothing in this Settlement Agreement constitutes a satisfaction of or release from any claim or cause of action against Respondents or any person not a party to this Settlement Agreement, for any liability such person may have under CERCLA, other statutes, or common law, including but not limited to any claims of the United States for costs, damages and interest under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607.

95.  No action or decision by U.S. EPA pursuant to this Settlement Agreement shall give rise to any right to judicial review.

## XXIII. CONTRIBUTION

96.  a.  The Parties agree that this Settlement Agreement constitutes an administrative settlement for purposes of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and that Respondents are entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Sections 113(f)(2) and 122(h)(4) of CERCLA, 42 U.S.C. §§ 9613(f)(2) and 9622(h)(4), for "matters addressed" in this Settlement Agreement.  The "matters addressed" in this Settlement Agreement are the Work, and Future Response Costs.

b.  The Parties agree that this Settlement Agreement constitutes an administrative settlement for purposes of Section 113(f)(3)(B) of CERCLA, 42. U.S.C. § 9113(f)(3)(B), pursuant to which the Respondents have, as of the Effective Date, resolved their liability to the United States for the Work, and Future Response Costs.

c.  Except as provided in Section XXI , Paragraph 90 of this Settlement Agreement (Non-Exempt De Micromis Waivers),"nothing in this Settlement Agreement precludes the United States or Respondents from asserting any claims, causes of action, or demands for indemnification, contribution, or cost recovery against any person not a party to this Settlement Agreement.  Nothing herein diminishes the right of the United States, pursuant to Section 113(f)(2)and (3), 42 U.S.C. § 9613(f)(2) and (3), to pursue any such persons to obtain additional response costs or response action, and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2).

31

## XXIV. INDEMNIFICATION

97. Respondents shall indemnify, save and hold harmless the United States, its officials, agents, contractors, subcontractors, employees and representatives from any and all claims or causes of action arising from, or on account of negligent or other wrongful acts or omissions of Respondents, their officers, directors, employees, agents, contractors, or subcontractors, in carrying out actions pursuant to this Settlement Agreement. In addition, Respondents agree to pay the United States all costs incurred by the United States, including but not limited to attorneys fees and other expenses of litigation and settlement, arising from or on account of claims made against the United States based on negligent or other wrongful acts or omissions of Respondents, their officers, directors, employees, agents, contractors, subcontractors and any persons acting on their behalf or under their control, in carrying out activities pursuant to this Settlement Agreement. The United States shall not be held out as a party to any contract entered into by or on behalf of Respondents in carrying out activities pursuant to this Settlement Agreement. Neither Respondents nor any such contractor shall be considered an agent of the United States.

98. The United States shall give Respondents notice of any claim for which the United States plans to seek indemnification pursuant to this Section and shall consult with Respondents prior to settling such claim.

99. Respondents waive all claims against the United States for damages or reimbursement or for set-off of any payments made or to be made to the United States, arising from or on account of any contract, agreement, or arrangement between any one or more of Respondents and any person for performance of Work on or relating to the Site. In addition, Respondents shall indemnify and hold harmless the United States with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between any one or more of Respondents and any person for performance of Work on or relating to the Site.

## XXV. INSURANCE

100. At least 21 days prior to commencing any On-Site Work under this Settlement Agreement, Respondents shall secure, and shall maintain for the duration of this Settlement Agreement, comprehensive general liability insurance and automobile insurance with limits of five million dollars, combined single limit, naming the United States as an additional insured. Within the same period, Respondents shall provide U.S. EPA with certificates of such insurance and a copy of each insurance policy. Respondents shall submit such certificates and copies of policies each year on the anniversary of the Effective Date. In addition, for the duration of the Settlement Agreement, Respondents shall satisfy, or shall ensure that their contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of Respondents in furtherance of this Settlement Agreement. If Respondents demonstrate by evidence satisfactory

32

to U.S. EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering some or all of the same risks but in an equal or lesser amount, then Respondents need provide only that portion of the insurance described above which is not maintained by such contractor or subcontractor.

## XXVI. FINANCIAL ASSURANCE

101. Within 30 days of the Effective Date, Respondents shall establish and maintain financial security for the benefit of U.S. EPA in the amount of $1,500,000 in one or more of the following forms, in order to secure the full and final completion of Work by Respondents:

    a. a surety bond unconditionally guaranteeing payment and/or performance of the Work;

    b. one or more irrevocable letters of credit, payable to or at the direction of U.S. EPA, issued by financial institution(s) acceptable in all respects to U.S. EPA equaling the total estimated cost of the Work;

    c. a trust fund administered by a trustee acceptable in all respects to U.S. EPA;

    d. a policy of insurance issued by an insurance carrier acceptable in all respects to U.S. EPA, which ensures the payment and/or performance of the Work;

    e. a corporate guarantee to perform the Work provided by one or more parent corporations or subsidiaries of Respondents, or by one or more unrelated corporations that have a substantial business relationship with at least one of Respondents; including a demonstration that any such company satisfied the financial test requirements of 40 C.F.R. § 264.143(f);

    f. a corporate guarantee to perform the Work by one or more of Respondents, including a demonstration that any such Respondent satisfies the requirements of 40 C.F.R. §143(f); and/or

    g. any other financial mechanism acceptable to and approved by U.S. EPA

102. Any and all financial assurance instruments provided pursuant to this Section shall be in form and substance satisfactory to U.S. EPA, determined in U.S. EPA's sole discretion. In the event that U.S. EPA determines at any time that the financial assurances provided pursuant to this Section (including, without limitation, the instrument(s) evidencing such assurances) are inadequate, Respondents shall, within 30 days of receipt of notice of U.S. EPA's determination, obtain and present to U.S. EPA for approval one of the other forms of financial assurance listed in Paragraph 102, above. In addition, if at any time U.S. EPA notifies Respondents that the anticipated cost of completing the Work has increased, then, within 30 days of such notification,

Respondents shall obtain and present to U.S. EPA for approval a revised form of financial assurance (otherwise acceptable under this Section) that reflects such cost increase. Respondents' inability to demonstrate financial ability to complete the Work shall in no way excuse performance of any activities required under this Settlement Agreement.

103. If Respondents seek to ensure completion of the Work through a guarantee pursuant to Subparagraph 101.e. or 101.f. of this Settlement Agreement, Respondents shall (i) demonstrate to U.S. EPA's satisfaction that the guarantor satisfies the requirements of 40 C.F.R. § 264.143(f); and (ii) resubmit sworn statements conveying the information required by 40 C.F.R. § 264.143(f) annually, on the anniversary of the Effective Date, to U.S. EPA. For the purposes of this Settlement Agreement, wherever 40 C.F.R. § 264.143(f) references "sum of current closure and post-closure costs estimates and the current plugging and abandonment costs estimates," the current cost estimate of $1,500,000 for the Work at the Site shall be used in relevant financial test calculations.

104. If, after the Effective Date, Respondents can show that the estimated cost to complete the remaining Work had diminished below the amount set forth in Paragraph 102 of this Section, Respondents may, on any anniversary date of the Effective Date, or at any other time agreed to by the Parties, reduce the amount of the financial security provided under this Section to the estimated cost of the remaining Work to be performed. Respondents shall submit a proposal for such reduction to U.S. EPA, in accordance with the requirements of this Section, and may reduce the amount of the security after receiving written approval from U.S. EPA. In the event of a dispute, Respondents may seek dispute resolution pursuant to Section XV (Dispute Resolution) and may reduce the amount of security in accordance with U.S. EPA's written decision resolving the dispute.

106. Respondents may change the form of financial assurance provided under this Section at any time, upon notice to and prior written approval by U.S. EPA, provided that U.S. EPA determines that the new form of assurance meets the requirements of this Section. In the event of a dispute, Respondents may change the form of the financial assurance only in accordance with the written decision resolving the dispute.

## XXVII. SEVERABILITY/INTEGRATION/APPENDICES

106. If a court issues an order that invalidates any provision of this Settlement Agreement or finds that Respondents have sufficient cause not to comply with one or more provisions of this Settlement Agreement, Respondents shall remain bound to comply with all provisions of this Settlement Agreement not invalidated or determined to be subject to a sufficient cause defense by the court's order.

107. This Settlement Agreement including its appendices, and any deliverables, technical memoranda, specifications, schedules, documents, plans, reports (other than progress reports), etc. that will be developed pursuant to this Settlement Agreement and become incorporated into

34

and enforceable under this Settlement Agreement constitute the final, complete and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Settlement Agreement. The parties acknowledge that there are no representations, agreements or understandings relating to the settlement other than those expressly contained in this Settlement Agreement. The following appendices are attached to and incorporated into this Settlement Agreement:

"Appendix A" is the SOW.

"Appendix B" consists of two documents depicting the Site, an aerial photograph and a map produced by the Montgomery County Appraiser's Office.

"Appendix C" is the list of Settling Parties ("Respondents") who have signed this Settlement Agreement and agreed to be bound by the terms of this Administrative Order on Consent (Settlement Agreement).

## XXVIII. ADMINISTRATIVE RECORD

108. U.S. EPA will determine the contents of the administrative record file for selection of the remedial action. Respondents shall submit to U.S. EPA documents developed during the course of the RI/FS upon which selection of the response action may be based. Upon request of U.S. EPA, Respondents shall provide copies of plans, task memoranda for further action, quality assurance memoranda and audits, raw data, field notes, laboratory analytical reports and other reports. Upon request of U.S. EPA, Respondents shall additionally submit any previous studies conducted under state, local or other federal authorities relating to selection of the response action, and all communications between Respondents and state, local or other federal authorities concerning selection of the response action. U.S. EPA shall establish a community information repository at or near the Site, to house one copy of the administrative record.

## XXIX. EFFECTIVE DATE AND SUBSEQUENT MODIFICATION

109. This Settlement Agreement shall be effective three days after the Settlement Agreement is signed by the Director of the Superfund Division or his/her delegate.

110. This Settlement Agreement may be amended by mutual agreement of U.S. EPA and Respondents. Amendments shall be in writing and shall be effective when signed by U.S. EPA. U.S. EPA Project Coordinators do not have the authority to sign amendments to the Settlement Agreement.

111. No informal advice, guidance, suggestion, or comment by the U.S. EPA Project Coordinator or other U.S. EPA representatives regarding reports, plans, specifications, schedules, or any other writing submitted by Respondents shall relieve Respondents of their obligation to

35

obtain any formal approval required by this Settlement Agreement, or to comply with all requirements of this Settlement Agreement, unless it is formally modified.

## XXX. NOTICE OF COMPLETION OF WORK

112. When U.S. EPA determines, that all Work has been fully performed in accordance with this Settlement Agreement, with the exception of any continuing obligations required by this Settlement Agreement, including but not limited to, payment of Future Response Costs, provision of Access, and record retention, U.S. EPA will provide written notice to Respondents. If U.S. EPA determines that any such Work has not been completed in accordance with this Settlement Agreement, U.S. EPA will notify Respondents, provide a list of the deficiencies, and require that Respondents modify the RI/FS Planning Documents or other work plan if appropriate in order to correct such deficiencies. Respondents shall implement the modified and approved RI/FS Planning Documents or other approved work plan and shall submit the required deliverable(s) in accordance with the U.S. EPA notice. Failure by Respondents to implement the approved modified RI/FS Planning Documents or other work plan shall be a violation of this Settlement Agreement.

The Undersigned Party enters into this Administrative Settlement Agreement and Order on Consent in the matter of the South Dayton Dump and Landfill Site.

Agreed this 2ND day of AUGUST , 2006

For Respondent KATHRYN A. BOESCH

Signature: _Kathryn U. Boesch_

Name: C/O TIMOTHY D. HOFFMAN

Title: COOLIDGE WALL

Address: 33 W 1ST ST
DAYTON OHIO 45402
(937) 449-5540

36

obtain any formal approval required by this Settlement Agreement, or to comply with all requirements of this Settlement Agreement, unless it is formally modified.

## XXX. NOTICE OF COMPLETION OF WORK

112. When U.S. EPA determines, that all Work has been fully performed in accordance with this Settlement Agreement, with the exception of any continuing obligations required by this Settlement Agreement, including but not limited to, payment of Future Response Costs, provision of Access, and record retention, U.S. EPA will provide written notice to Respondents. If U.S. EPA determines that any such Work has not been completed in accordance with this Settlement Agreement, U.S. EPA will notify Respondents, provide a list of the deficiencies, and require that Respondents modify the RI/FS Planning Documents or other work plan if appropriate in order to correct such deficiencies. Respondents shall implement the modified and approved RI/FS Planning Documents or other approved work plan and shall submit the required deliverable(s) in accordance with the U.S. EPA notice. Failure by Respondents to implement the approved modified RI/FS Planning Documents or other work plan shall be a violation of this Settlement Agreement.


The Undersigned Party enters into this Administrative Settlement Agreement and Order on Consent in the matter of the South Dayton Dump and Landfill Site.

Agreed this _1st_ day of _August_ , _2006_ .

For Respondent _GENERAL MOTORS CORPORATION_

Signature: _James P. Walle_

Name: _JAMES P. WALLE_
_Attorney At Law      P31198_

Title: _____

Address: _300 RENAISSANCE CENTER_
_M/C 482-C24-024_
_DETROIT, MI 48243_

obtain any formal approval required by this Settlement Agreement. or to comply with all requirements of this Settlement Agreement, unless it is formally modified.

## XXX. NOTICE OF COMPLETION OF WORK

112. When U.S. EPA determines, that all Work has been fully performed in accordance with this Settlement Agreement. with the exception of any continuing obligations required by this Settlement Agreement, including but not limited to, payment of Future Response Costs, provision of Access, and record retention, U.S. EPA will provide written notice to Respondents. If U.S. EPA determines that any such Work has not been completed in accordance with this Settlement Agreement, U.S. EPA will notify Respondents, provide a list of the deficiencies, and require that Respondents modify the RI/FS Planning Documents or other work plan if appropriate in order to correct such deficiencies. Respondents shall implement the modified and approved RI/FS Planning Documents or other approved work plan and shall submit the required deliverable(s) in accordance with the U.S. EPA notice. Failure by Respondents to implement the approved modified RI/FS Planning Documents or other work plan shall be a violation of this Settlement Agreement.


The Undersigned Party enters into this Administrative Settlement Agreement and Order on Consent in the matter of the South Dayton Dump and Landfill Site.


Agreed this 2ND day of AUGUST , 2006

For Respondent MARGARET C. GRILLOT

Signature: Margaret C. Grillot

Name: C/O TIMOTHY D. HOFFMAN

Title: COOLIDGE WALL

Address: 33 W 1ST ST
DAYTON, OHIO 45402
(937) 449-5540

36

obtain any formal approval required by this Settlement Agreement, or to comply with all requirements of this Settlement Agreement, unless it is formally modified.

## XXX. NOTICE OF COMPLETION OF WORK

112. When U.S. EPA determines, that all Work has been fully performed in accordance with this Settlement Agreement, with the exception of any continuing obligations required by this Settlement Agreement, including but not limited to, payment of Future Response Costs, provision of Access, and record retention, U.S. EPA will provide written notice to Respondents. If U.S. EPA determines that any such Work has not been completed in accordance with this Settlement Agreement, U.S. EPA will notify Respondents, provide a list of the deficiencies, and require that Respondents modify the RI/FS Planning Documents or other work plan if appropriate in order to correct such deficiencies. Respondents shall implement the modified and approved RI/FS Planning Documents or other approved work plan and shall submit the required deliverable(s) in accordance with the U.S. EPA notice. Failure by Respondents to implement the approved modified RI/FS Planning Documents or other work plan shall be a violation of this Settlement Agreement.

The Undersigned Party enters into this Administrative Settlement Agreement and Order on Consent in the matter of the South Dayton Dump and Landfill Site.

Agreed this _1_ day of _August_, 2_006_

For Respondent _Hobart Corporation_

Signature _[signature]_

Name: _Philip S. Dallosto_

Title: _Associate General Counsel_

Address: _Illinois Tool Works Inc._
_3600 West Lake Avenue_
_Glenview, IL 60026_

NOTE: Hobart Corporation is a wholly owned subsidiary of Illinois Tool Works Inc.

36

obtain any formal approval required by this Settlement Agreement, or to comply with all requirements of this Settlement Agreement, unless it is formally modified.

## XXX. NOTICE OF COMPLETION OF WORK

112. When U.S. EPA determines, that all Work has been fully performed in accordance with this Settlement Agreement, with the exception of any continuing obligations required by this Settlement Agreement, including but not limited to, payment of Future Response Costs, provision of Access, and record retention, U.S. EPA will provide written notice to Respondents. If U.S. EPA determines that any such Work has not been completed in accordance with this Settlement Agreement, U.S. EPA will notify Respondents, provide a list of the deficiencies, and require that Respondents modify the RI/FS Planning Documents or other work plan if appropriate in order to correct such deficiencies. Respondents shall implement the modified and approved RI/FS Planning Documents or other approved work plan and shall submit the required deliverable(s) in accordance with the U.S. EPA notice. Failure by Respondents to implement the approved modified RI/FS Planning Documents or other work plan shall be a violation of this Settlement Agreement.

The Undersigned Party enters into this Administrative Settlement Agreement and Order on Consent in the matter of the South Dayton Dump and Landfill Site.

Agreed this 3 day of August , 2006.

For Respondent Kelsey Hayes Company

Signature:

Name:  David Bialosky

Title:  Vice President & General Counsel

Address: 12001 Tech Center Drive, Livonia, MI 48154

36

obtain any formal approval required by this Settlement Agreement, or to comply with all requirements of this Settlement Agreement, unless it is formally modified.

## XXX. NOTICE OF COMPLETION OF WORK

112. When U.S. EPA determines, that all Work has been fully performed in accordance with this Settlement Agreement, with the exception of any continuing obligations required by this Settlement Agreement, including but not limited to, payment of Future Response Costs, provision of Access, and record retention, U.S. EPA will provide written notice to Respondents. If U.S. EPA determines that any such Work has not been completed in accordance with this Settlement Agreement, U.S. EPA will notify Respondents, provide a list of the deficiencies, and require that Respondents modify the RI/FS Planning Documents or other work plan if appropriate in order to correct such deficiencies. Respondents shall implement the modified and approved RI/FS Planning Documents or other approved work plan and shall submit the required deliverable(s) in accordance with the U.S. EPA notice. Failure by Respondents to implement the approved modified RI/FS Planning Documents or other work plan shall be a violation of this Settlement Agreement.

The Undersigned Party enters into this Administrative Settlement Agreement and Order on Consent in the matter of the South Dayton Dump and Landfill Site.

Agreed this _____ day of _____, 2006.

For Respondent _____

Signature: _____

Name: _____

Title: _____

Address: _____

It is so ORDERED AND AGREED this _____10th_____ day of _August_, 2006.

BY: _____        DATE:_____8/10/2006_____

    for Richard C. Karl, Director
    Superfund Division
    U.S. Environmental Protection Agency
    Region 5

EFFECTIVE DATE: _____8/15/2006_____

37